## LONE STAR GAS CO. v. CITY OF FORT WORTH, TEX., et al.

### Nos. 805, 804.

District Court, N. D. Texas, Fort Worth Division.

June 13, 1936.

Roy C. Coffee and Marshall Newcomb, both of Dallas, Tex., and Walker, Smith & Shannon, Thompson & Barwise, and Ogden K. Shannon, all of Fort Worth, Tex., for complainant.

R. E. Rouer, City Atty., J. M. Floyd, George C. Kemble, and R. B. Young, Jr., all of Fort Worth, Tex., for respondents.

ATWELL, District Judge.

In July, 1934, the city of Fort Worth passed an ordinance effective August 17, 1934, which dealt with and prescribed certain characteristics for gas and gas service. On the day it was to become effective the complainant instituted a cause in equity against the city and certain city officials, asserting its invalidity. On June 5, 1935, the city council passed Ordinance No. 1,834. Seven days later the complainant filed a suit against the city and certain officials, wherein it prayed for temporary and permanent injunctions.

The first ordinance, having been amended and superseded, need not interest us except as it may indicate the judgment of the city legislature that it was too stringent.

The ordinance under consideration has eight sections, the first four of which claim our attention. Of the last four, the fifth relates to divisibility; the sixth repeals all prior ordinances in conflict; the seventh provides that: "Any person, firm or corporation, their agents, servants or employees, violating any provisions of this ordinance shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not to exceed $200.00 and each days violation thereof shall constitute a separate offense." The eighth section relates to publication and its effective date.

The first four sections are as follows: "Sec. I. That all persons, firms, or corporations engaged in the business of furnishing or distributing natural gas to the inhabitants of the City of Fort Worth shall furnish natural fuel gas to the consumers; that the term 'natural fuel gas', as used herein is intended to mean natural gas of the quality and character produced by nature in the petroleum, oil, and natural gas fields of Texas, Oklahoma, Louisiana, or elsewhere, which shall not be changed in any way except as provided in the following portion of this section. Helium and sulphur content, and/or natural gas, gasoline, oil, or gasoline vapors, propane, and butane may be extracted from said gas. Said gas shall be delivered to the consumer without the addition of air or the elements of air from which the oxygen content has been extracted or any other gas not naturally produced in petroleum oil, or natural gas fields, except such small inclusions of air as may be unavoidably included during the normal recovery of natural gas from the wells.

"Sec. II. That no natural gas shall be delivered and sold to any consumer which shall contain less than one thousand (1,000) British Thermal Units per cubic foot of the natural gas, as determined at a temperature of 60 degrees Fahrenheit and a pressure equivalent to 30 inches of mercury at 32 degrees Fahrenheit and water vapor saturated. The British Thermal Unit content of the natural gas shall be determined and calculated from the gas discharged from the service main.

"Sec. III. That natural gas shall be measured for sale to the consumer on the basis of the temperature, pressure, and humidity, existing in the meter at the time the gas is measured, unless by agreement between buyer and seller, a pressure higher than eight (8) ounces gauge is maintained at the outlet of the meter. In the latter case, the volume measured shall be corrected to a pressure base of eight (8) ounces above 14.43 pounds per square inch.

"Sec. IV. That the natural gas shall be delivered at the outlet of the consumer's metering device at a pressure of not less than four (4) ounces above atmospheric pressure and not more than eight (8) ounces above atmospheric pressure, unless some higher pressure had been agreed upon between the person, firm or corporation distributing the gas and the individual customer. Nothing herein shall in any manner abrogate any contractual agreements relating to pressure applicable to industrial consumers. The penalties provided for herein shall not apply to violations of the provisions of this section unless the person, firm or corporation distributing the gas shall fail to promptly correct conditions constituting those violations whenever such violations or any of them are discovered."

The major contest seems to wage around section I. The complainant contends that it is unreasonable, arbitrary, and will result in serious loss to it. The respondent asserts that the citizens of Fort Worth are not receiving the sort of gas service to which they are entitled; that it has a larger percentage of inerts than is justified; that the user is not safe from the dangers of carbon monoxide poisoning.

Judge Wilson appointed a master. That officer took testimony covering eleven volumes of 140 pages each. He then filed his report, exhibiting sixty-two findings of facts, with conclusions of law. These findings and conclusions were attacked by the complainant.

Judge Wilson then withdrew from the case and the writer took it over. After ten days study of the record, oral argument was had on June 9, at Dallas.

Fourteen witnesses were introduced. Schmidt, Huddleston, Hulcy, Carmichall, and Denning, were all connected with the complainant. Everman, for complainant, was formerly utility supervisor of Dallas. Then came McLean, Keller, Wright, Camp, Weaver, Mahlie, Livingston, and Jones. Of these Mahlie, Livingston, Keller, and Wright were employees of the city. Weaver was employed by the city for this special work. Camp was a plumber. Livingston was a geologist. Jones was an active agitator, who was in the business of selling a gas burner. There is testimony in the record upon all phases of the contentions of each side.

The complainant has been supplying gas to the city of Fort Worth, either directly or through a local distributing company, since 1909. From that date to 1917, Petrolia, in Texas, was the sole source. In that year, lines were laid to Oklahoma and gas from those fields brought to Petrolia, where it was mixed with that gas and transmitted to Fort Worth and other Texas towns. In 1920, lines were laid to Palo Pinto county; about the same time they were also laid to Joshua and Gordon. Palo Pinto gas came into the Joshua line and reached Fort Worth from the south. The heat content of gas is measured in terms of British Thermal Units, or BTU's. One BTU is the amount of heat required to raise one pound of water one degree Fahrenheit. Petrolia gas had a BTU content of approximately 750 from 1917 to 1922. The Oklahoma gas which came to Petrolia, and was there mixed, had a content of about 1,000. The Palo Pinto gas was slightly in excess of 1,000 BTU's. This combination of Petrolia and Oklahoma gas was supplied to Fort Worth in 1918 and 1919. Its BTU content was 849 in 1918 and 930 in 1919. From 1920 to 1922 the Petrolia and Oklahoma gas had a BTU content of around 930, while the Palo Pinto gas registered 1,020.

When the cold weather came, the available gas was insufficient. From December, 1923, to October, 1924, the complainant secured residue gas from casing head plants in West Texas, which was mixed with gas from dry wells in the same section. This mixture had an average BTU content of about 1,200, but sometimes reached as high as 1,400 BTU's. It will be recalled that casing-head gas is gas that is produced from oil wells. If it were not utilized in this manner, it would go to waste. This mixture was supplied to Forth Worth, and the mixture from Petrolia and Oklahoma was likewise supplied. With these gases gathered from the sources indicated, there were complaints. The testimony with reference to such inadequate or incomplete service may not be said to be entirely satisfactory, but the complainant evidently thought so, and sought to remedy the situation. That portion of the West Texas gas which was casing-head gas, or wet gas, and without which sufficient gas seemed to be, at that time, unavailable, was to blame. Thereupon the complainant made extensive in-

vestigation, and concluded that a plant, which would stabilize the BTU content of the various gases that it was making use of, would result in better service, and expended a little less than $500,000 in building the Joshua plant which manufactures from West Texas gas the inerts, which it forces into the West Texas gas lines, and which stabilizes or standardizes the mixture of gases that finally reaches the Fort Worth consumer, and the consumers of approximately sixty other cities and towns, including the city of Dallas, to around 1,000 BTU's. This service has been maintained for about twelve years, with a rather high degree of satisfactoriness to itself and its customers.

There is probably not enough gas available for the city of Fort Worth without the use of the West Texas gas. The West Texas gas is diluted with the Joshua inerts, and as thus doctored or standardized, apparently meets the needs and necessities of all of the complainant's customers, save and except those who are complaining in Fort Worth. There is no way to continue to supply cities other than Fort Worth, and to delete the inerts from the West Texas gas, for the satisfaction of Fort Worth. All the gas from Joshua east has been treated with inerts. The inert treated gas satisfies all except Fort Worth. If the complainant is to continue to supply gas from West Texas to Fort Worth, then it would be necessary to build another line at a cost of $300,000 from Joshua to Fort Worth. The wet, or casing-head, gas is the property of the complainant, or the complainant has contracts with producers thereof, with which it must comply.

The record does not definitely disclose satisfactory complaints in the city of Fort Worth. I do not mean by that that the record does not show that there was no complaining, but it is of such a nebulous nature that one finds difficulty in valuing it.

There has been some carbon monoxide poisoning which resulted in two deaths. Dr. McLean testified that he had ministered to a number of persons who, from their reported symptoms, seemed to be sufferers from that particular cause. Such result might follow improper product, as well as improper handling by the consumer. The very nature of gas is such that bad results are often attributable to one who

uses rather than to the source of supply. Appliances are also responsible.

Be that as it may, we must confess that the record discloses some complaint —probably justifiable—during the twelve years that the Joshua plant has functioned. If there were any justifiable complaints—complaints due to faulty product—dangerous in its distribution and use, then and in that event, the city would be justified in prohibiting.

We must bear in mind that we are treating really three gases, i. e.: Wheeler county, called "Shamrock," which joins with Oklahoma, and comes into North Fort Worth via Petrolia; West Texas, from a number of fields, mixed before reaching Gordon, and then delivered via Joshua; and the third is that which, having been gathered from West Texas and concentrated at Gordon, flows by Joshua where it is diluted with inerts. This dilutent reached, in 1934, 19.2 per cent. of the whole, which, in the aggregate, amounted to approximately 2,800,000,000 cubic feet per year or enough in meter readings, if it were burnable gas, to have supplied the city of Fort Worth. Such inerts register on the meter, but do not burn. So the complainant is manufacturing and placing into that which it sells, something which is useless to the buyer, save and except as it may be a standardizer or stabilizer of many gases. Such standardizing or diluting is imperative when a mixture of gases with different heat units is used. Air may be used instead of a nitrogen inert. The inert that is used is otherwise useless to the consumer. Whatever the inert, it causes the meter to click.

Knowledge of the use made of the Joshua plant is probably responsible for a great deal of the feeling that exists against the complainant in the city of Fort Worth.

If we now deal, slightly more directly, with the complainant's exceptions to the master's findings of fact, we may overrule all of them down to the twenty-third. The twenty-third is abstractly correct. Theoretically that gas is most desirable which has the largest heat content, but practically a gas which has the largest heat content might be wholly useless unless all of the gases that were mixed in order to furnish sufficient flow for a city, likewise, had a high heat content.

In a separate order I have indicated a ruling on the other findings of fact,

from the twenty-fourth to the sixty-first, inclusive.

The order of reference contained the following: "It is now ordered that this cause be referred to Maurice Cheek, of Fort Worth, Texas, as special master, to take and hear the evidence offered by the respective parties and to make his conclusions as to the facts in issue, and recommend the judgment to be entered thereon; the special master in chancery is authorized and empowered to do all things and to make such order as may be required to accomplish a full hearing on all matters of fact and law in issue in this cause."

In spite of the sustaining of some of the criticism to some of the findings of fact, there are sufficient findings that remain to justify finding sixty-two.

Finding 62 is to the effect that the ordinance is reasonable; that a compliance with its terms will make for more satisfactory gas service in Fort Worth; and that the city council did not act unreasonably nor arbitrarily in reaching the conclusion that the ordinance would improve the quality and safety of the gas service.

Complainant's exceptions maintain that the finding is unsupported by any evidence; is based upon the assumption that the present service is not satisfactory; that it is contrary to the great and overwhelming weight of the testimony; and, finally, that it is supported only by formula and laboratory tests rather than by actual, service facts.

What has been said with reference to some of the other findings and exceptions applies to this one. There is sufficient testimony in the record to support it. There is also sufficient testimony in the record to support a finding on the other side. There is no finding that is unsupported by any testimony.

■ The reference to the master was apparently made by Judge Wilson with the consent of all parties, and upon an order approved by them. There is nothing in the record to indicate that the choice of the person was that of the litigants. The rule, therefore, which controls, is announced in Parker v. Interstate Trust & Banking Company, 56 F.(2d) 792, by the Circuit Court of Appeals for the Fifth Circuit. In a reference by consent, the findings of the master upon conflicting testimony are unassailable. Though the order be consented to, if the master is the court's, rather than the parties', his findings are entitled to great weight and should not be disregarded unless clearly wrong, especially where the testimony is taken orally before him and the judge acts only on the record. See, also, Tilghman v. Proctor, 125 U.S. 136, 8 S.Ct. 894, 901, 31 L.Ed. 664. In that case, it was said that: "In dealing with these exceptions, the conclusions of the master, depending upon the weighing of conflicting testimony, have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been error or mistake on his part."

The complainant insists with creditable plausibility that the ultimate finding of witness Weaver, presented by the respondents, supports the theory as well as the effective gas service practice, that some dilution is necessary for the mixture of gases that are served to the complainant's customers. Weaver fixes such dilutent at 4 per cent. and suggests that air could be used.

■ The testimony taken before the master is quite sufficient to support the condemnation leveled by the respondents, to both the theory and practice of the complainant. Actually the complainant is introducing a large per cent. of nitrogen inert. The fact that this large percentage of each cubic foot does not rob the customer of any BTU value, *to which he is entitled,* is not sufficient to entitle the complainant to relief. The law having required the complainant to originally serve gas that had about 670 BTU's, and later having raised it to a thousand BTU's, and the fact that the complainant has really been serving a gas with a little more than that legally required of it, does not excuse it for putting something else into the cubic foot so served, even though that something else does not rob the consumer of any *heat value,* if the legislative department of the municipality, clothed with police power, *reasonably concludes that that something else is unsafe and liable to produce harm to the user.* The economic answer does not reach the situation. The general power, which the city government has to save the people from that which would harm, may not be questioned. This court may not be an apologist for a theory or a practice which includes

that which is harmful. The testimony being ample, though if the witnesses were heard a different result might appear, to support the claim of the city council that the service was unsatisfactory and unsafe, it may not be disturbed or altered by judicial atmosphere.

 While it is true that the· reasonableness of the exercise of police power may be scrutinized through both facts and law (Ohio Valley Water Co. v. Ben Avon Borough, 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908; Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598), where legislative action is within the scope of such power, fairly debatable questions as to its reasonableness, wisdom, and propriety are not for the determination of the court. Standard Oil Co. v. City of Marysville, 279 U.S. 582, 49 S.Ct. 430, 73 L.Ed. 856. See, also, State v. Lone Star Gas Co. (Tex.Civ.App.) 86 S.W.(2d) 484; Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853 (Dec. 1, 1935); Powell v. Commonwealth of Pennsylvania, 127 U.S. 678, 8 S.Ct. 992, 1257, 32 L.Ed. 253. Police power may never be exerted arbitrarily nor unreasonably, however (Nashville, C. & St. L. Ry. v. Walters, 294 U.S. 405, 55 S.Ct. 486, 79 L.Ed. 949), and is founded in public necessity, which justifies its exercise. Spann v. City of Dallas, 111 Tex. 350, 235 S.W. 513, 19 A.L.R. 1387. As to the question of arbitrariness and unreasonableness, as stated above, the due process clause of the Fourteenth Amendment justifies a complainant in demanding the independent judgment of the court as to both law and facts. Bluefield Water Works & Improvement Company v. Public Service Commission, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176.

There is nothing in the case of Weaver v. Palmer Brothers Co., 270 U.S. 402, 46 S.Ct. 320, 70 L.Ed. 654, to the contrary. In that. particular case the State Legislature had prohibited the use of shoddy in the manufacture of comfortables. The testimony showed, irrefutably, that shoddy, when sterilized, is and was harmless to the sleeper, or the recumbent user of the mattress. That being true, a law which denied a manufacturer the right to use it was arbitrary and unreasonable.

The case presented here is different. There is a sharp conflict between the city employees and the gas company's employees, and there is a sharp conflict between other interested and advocating witnesses on each side. There are some things in the record, as I have already said, which indicate that some of those who appeared had deep resentment and feeling, but it must be assumed that the master who heard and saw each witness as he testified, gave such weight to conditions, dispositions, and attitudes of that sort, as a careful weigher of testimony usually does.

A further uncalled for, perhaps needless, observation, may be indulged. The complainant has a large investment. It is officered and controlled by men who are desirous of furnishing to the citizen this surprisingly attractive and convenient form of heat. Constant friction and differences between a utility so engaged, and the less thoughtful citizen, is never productive of very much valuable harvest. Contests are expensive and frequently arise from political agitation. The strong men who control the utility, and the strong men in official position who think for the people, should come together in this particular case and save each from inconvenience and loss.

A decree may be drawn denying the relief prayed for, and dismissing the bill.