## FOX et al. v. KNICKERBOCKER ENGRAVING CO.

(Circuit Court, S. D. New York. January 10, 1908.)

### No. 8,773.

1. **PATENTS—DAMAGES FOR INFRINGEMENT—ESTABLISHED LICENSE FEES.**

Where the owners of a patent granted an exclusive license thereunder, authorizing the licensee to grant licenses to others on such terms as it saw fit, reserving as a royalty a certain per cent. of the profits realized by the licensee, in a joint suit by the owners and licensee for infringement which interfered with sales by the licensee and the granting of licenses, the license fee established, charged, and received by the licensee may properly be taken as a basis for the computation of damages and profits recoverable from the infringer.

[Ed. Note.—Accounting by infringer for profits, see note to Brickill v. City of New York, 50 C. C. A. 8.]

2. **SAME.**

Where two different uniform license fees under a patent prevailed at different periods of time, the fee having been reduced on a certain date, an infringer whose infringement commenced during the first period and extended into the second may properly be charged with damages at the higher rate until he ceased to infringe; but where he subsequently again commenced infringement, his liability should be measured by the rate then prevailing.

3. **SAME.**

Evidence *held* sufficient to show uniform established license fees under a patent during the time of its infringement by defendant.

4. **SAME—INCREASE OF DAMAGES BY COURT.**

Where a defendant knowingly infringed a patent and continued such infringement after suit brought, taking business away from licensees by cutting prices, the case is a proper one for the court in the exercise of its discretion, under Rev. St. § 4921 [U. S. Comp. St. 1901, p. 3395], to award the complainant treble damages.

In Equity. On the master's report and exceptions thereto, the complainants move to confirm the report, overrule the exceptions, and treble the amount awarded under section 4921 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3395], while defendant moves for the allowance of its exceptions, and prays no decree for a money judgment be made or any master's fee or costs be allowed.

See 140 Fed. 714.

Philip C. Peck, for complainants.
Albert H. Walker, for defendant.

RAY, District Judge. December 15, 1905, an interlocutory decree herein was entered in favor of complainants against the defendant, adjudging that defendant had infringed U. S. letters patent to Thomas S. Fox, May 28, 1901, No. 675,272, for improvements in half tone

negatives, by making and using half tone negatives, and also by using in the manufacture of same the methods and processes described in certain claims of such patent, and that complainants recover of defendant the gains, profits, savings, and advantages which it had derived, received, or made by reason of such infringements. It was referred to a special master, John A. Shields, Esq., to ascertain and state among other things the gains, profits, savings, and advantages made and derived by defendant through such infringements. On the coming in of the report defendant filed his exceptions thereto, nine in number, and which allege errors as follows: (1) In the finding, in substance, that complainants had established a uniform license fee which they had maintained in the city of New York, etc., and that same was at the rate of $15 per week. (2) In the finding, in substance, that the Waterproof Film & Equipment Company receives a license fee of $3 per week from the North American Engraving Company, but that said company obligates itself to pay, under the license, a balance of $850, which goes to Mr. Fox, the patentee. (3) In the holding of the master as to license fees as a measure of damages in that it is inconsistent with the rule stated in Rude v. Westcott, 130 U. S. 165, 9 Sup. Ct. 468, 32 L. Ed. 888, that, "In order that a royalty may be accepted as a measure of damages against an infringer who is a stranger to the license establishing it, it must be paid by such a number of persons as to indicate a general acquiescense in its reasonableness by those who have occasion to use the invention, and it must be uniform at the place where the licenses are issued." (4) In the finding, in substance and effect, that the patented process was used by defendant in making all the half tone plates for certain parties within a certain time. (5) In the finding, in substance, that defendants infringing work or acts were from November 27, 1903, to August 22, 1904, and from December 1, 1904, to February 6, 1905. (6) In the finding that "the defendant destroyed all file proofs of their use of the infringing process prior to the commencement of this accounting." (7) In the holding that complainants, having made out a prima facie case of damages, are entitled to the presumption that, "where the defendant has an opportunity to vary complainants' prima facie proofs and does not, the defendant cannot do so," for the reason complainants made no prima facie case. (8) In the holding that "actual damages may be calculated where complainants furnish some reasonable basis or data on which to calculate the same," for the reason that the evidence does not furnish any reasonable basis or data on which to calculate damages. (9) In the holding that "complainants are entitled to recover from the defendant, as their damages, the sum of $705, being for a period of infringement comprising forty-seven weeks, at a prevailing rate of royalty or license fee of $15 per week." Defendant says there is no proof of such prevailing rate of royalty or license fee and there is no proof of infringement for that time. These exceptions require and demand a careful scrutiny of the evidence which has been given. The defendant does not quarrel with the rules of law stated but says there is no evidence permitting or justifying their application in this case.

Under the agreement between the owners of the patent, Thomas S. Fox and William H. Mackey and the North American Engraving

Company, dated August 5, 1902, and in force until March 9, 1904, which made the said engraving company exclusive licensee with power to grant licenses, said engraving company was to pay to said owners, "for the use of said patent and as royalty therefor, twelve and one-half per centum of the gross selling price of all goods turned out by the party of the second part to its private customers, and, in addition thereto, one-half of all the profits arising to it from the transfer or other disposition by it to other persons, firms, or corporations of patent rights or territorial rights under said patent." Therefore, during the time from August 5, 1902, to March 9, 1904, the loss or damage to complainants Fox and Mackey by reason of infringement depriving the licensee of sales of licenses was one-half of the license fee charged by said engraving company, as there was no provision requiring it to establish or maintain any particular license fee. The license fee it would charge was optional with it. In addition, the loss or damage to Fox and Mackey during such time was 12½ per centum of any deprivation by reason of such infringement of private customers to the engraving company. March 9, 1904, said North American Engraving Company assigned the said agreement to the complainant Waterproof Film & Equipment Company, and on the same day Fox and Mackey granted a sole and exclusive license to said last-named company to use, vend, and sell under the patent, and to grant licenses thereunder, no license fee which it was to demand being specified. Such agreement contained a provision that the last-named company should obtain from the North American Engraving Company a release of all claims and demands and rights arising under the agreement between Fox and Mackey and said engraving company. This was done, evidently, by taking an assignment of the said agreement, as a short cut, and the legal result was that the Waterproof Film & Equipment Company became sole licensee under Fox and Mackey, with power to grant licenses without restriction. Without quoting all the agreements as to consideration for such license it is sufficient to say that in legal effect they were that the Waterproof Film & Equipment Company would pay each and every year to Fox and Mackey $780, in any event, in regular weekly payments, and such further sum as would make the total sum paid each year, equal to 16⅔ per centum of the gross receipts of the Waterproof Company, or 25 per centum of the net profits. The $780 was to go to Mr. Fox. The provision referred to reads as follows:

"In each and every year during the continuance of this agreement the party of the second part shall pay to the said Thomas S. Fox, the sum of seven hundred and eighty dollars ($780) in regular weekly payments of fifteen dollars ($15) each; and on the first secular days of March, June, September and December of each and every year and on each of said days the party of the second part shall pay to the party of the first part such an amount as may be necessary to make the total payment for the three months next preceding, including the sums paid to the said Thomas S. Fox, equal to sixteen and two thirds per centum of the gross receipts or to twenty-five per centum of the net profits as provided in the third clause hereof."

Infringements by others which lessened these receipts or profits damaged the complainants. As there is proof that the defendants' infringements did injure the business of the North American Engraving Company and interfere with its sales, and profits and grant-

ing of licenses, and, also, did injure the business of the Waterproof Film & Equipment Company and interfered with its sales, and profits, and granting of licenses, I think the master was correct and justified in resorting to the license fees established, charged, and received as a basis for estimating damages.

The evidence as to license fees came from James H. Miller, now or at one time treasurer of the North American Engraving Company and who has been with it since 1899. He says that the North American Engraving Company first granted licenses in December, 1902, and that the royalty was $15 per week to engraving houses in New York City and $12 per week to the newspapers in New York City, and that these sums were paid, and that between December, 1902, and February 6, 1905, that company granted over a dozen licenses—10 at least—all under this Fox patent, 8 to photo-engravers and 2 to newspapers; mostly signed contracts; not for the life of the patents; for different periods, some renewed, some not; all for short periods however. Also, that after the Waterproof Film & Equipment Company took the assignment and made its agreement March 9, 1904, the license fee was reduced to $3 per week. The witness states that in 1905 the license fee was reduced to $3 per week for the reason "it was determined that that price was too great for success, and there were other reasons which don't pertain to this at all which led us to put it at a much lower rate later on." That is at a rate less than $15 per week. Then on an answer being insisted on giving all the reasons, he said in answer to the question:

"Q. And afterwards, why did you come down to three? A. We thought that was the price, since we having had two years' experience to know the general way it was regarded in the trade, that $15 was too much, and that three perhaps was a better rate, and that was made by the Waterproof Film & Equipment Company, and not the North American Engraving Company."

The Waterproof Film & Equipment Company granted about a half dozen licenses including one to the North American Engraving Company at $3 per week for license fee. On being closely questioned, the witness said "Yes" to the following question:

"So, when you get down to the bottom of the matter, all you know about that is that the North American Company has paid to the Waterproof Film & Equipment Company during the last two years $3 a week for license fee under Fox patent?"

Prior to that he had said in answer to questions as follows:

"Q. How much money has the North American Engraving Company paid to the Waterproof Film & Equipment Company for license fees under the Fox patent since the beginning of 1905? A. That is practically one year, isn't it? Q. A little more. A. I think it has paid over $1,000; I am not sure. Q. What was the North American Company authorized to do with the Fox patent for this thousand dollars, more or less? A. To use the process in its half tone negatives. Q. Was it not also authorized to license other people under the Fox patent? A. The North American? Q. Yes. A. Oh, no; no, right at all. Q. How much per week did the North American pay to the Waterproof Film & Equipment Company during the year 1905 for license fees under the Fox patent? A. License fees only? Q. Yes. A. Paid for license fees $3 a week. Q. For what did it pay the other $850, as $3 a week would be only about $150? A. The North American Engraving Company has a contract

with Mr. Fox himself. The balance goes to him. Q. Then am I right in understanding you that during the year 1905 the Waterproof Film & Equipment Company was the institution that had the sole right to grant licenses under the Fox patent? A. Yes. Q. And during the year 1905 the Waterproof Film & Equipment Company granted a license to the North American Engraving Company for $3 a week under the Fox patent; is that right? A. Yes, sir."

No further explanation was given as to the consideration for the payment of this $1,000 by the North American Engraving Company to the Waterproof Film & Equipment Company. I am inclined to think there was some arrangement by which the engraving company assumed the payment to Fox of the $780 mentioned in the agreement between Fox and Mackey and the Waterproof Company, but we are in utter darkness on the subject.

The evidence does not to my mind establish that the Waterproof Company ever charged or received more than $3 per week as a license fee, or that the North American Engraving Company paid more than that sum as a license fee. The witness says the license fee paid by that company was $3 per week. Taking into account that the agreement between Fox and Mackey and the Waterproof Film & Equipment Company called for $780 per annum in any event, and the other percentages named, we may surmise that this or some sum was assumed by the engraving company as a consideration for its license, but neither party gave any evidence tending to show that the engraving company paid $850 or any sum to Fox as a license fee or as a consideration for the use of the patented processes. It was incumbent on complainant to give evidence legitimately tending to show this before defendant was called upon to controvert it. The witness repeatedly stated at all times that the license fee charged and received by the Waterproof Company was $3 per week. He said this was the sum paid by the engraving company to that company as a license fee, and nothing was said as to the consideration for the payment to Fox. But the evidence is conclusive that the license fee after March 9, 1904, was only $3 per week. As the master took the license fees as his basis for estimating and calculating the damages we are confined to that in fixing damages. On the evidence the periods of infringement were found to be, I think correctly, from November 27, 1903, to August 22, 1904, and from December 1, 1904, to February 6, 1905, or 47 weeks. The regular and established license fee from November 27, 1903, to March 9, 1904, at which time the agreement was assigned to the Waterproof Film & Equipment Company and it established a license fee of $3 per week, a period of 14 weeks, was $15 per week. From March 9, 1904, to August 22, 1904, a period of 23½ weeks, the regular and established license fee was $3 per week, and from December 1, 1904, to February 6, 1905, a period of 9½ weeks, it was the same—$3 per week. Some of these damages accrued to the North American Engraving Company, but by the assignment of March 9, 1904, they were duly assigned to William H. Mackey and Thomas S. Fox. The damages on the basis adopted by the master are, therefore, $591, not $705, and the master's report must be modified accordingly.

I know of no law that prevents a change in the amount charged as a license fee at a given time. To make it "uniform" it is not necessary that it be uniform for all time, or that each and every person taking a license shall pay that exact sum under all circumstances and conditions. If it is uniform for a considerable period of time, and accepted and paid by those who take licenses during that time it answers the rules of law even if, during that period for some peculiar reason or special circumstances, a lesser fee is accepted from a few persons. This is especially true where, as here, the license fee charged was uniform at $15 per week, except to newspapers—only two of them—while the North American Engraving Company controlled the patent, and was uniform at $3 per week after its control passed to the Waterproof Film & Equipment Company. In this case, as the infringer belonged to the engraver class, and the fee charged by the North American Company to that class was uniformly $15 per week, and as defendant took business away from that company by its infringements and thus actually damaged the complainants, that fee governs as to all the time the engraving company controlled the granting of licenses. The defendant cannot claim the benefit of the subsequent reduction, except as to the infringements committed after the reduction was actually made. I take it that if A. converts property to B., of the same kind, on two different occasions, and is sued for the conversions, and it appears that the value of the property converted was $50 per ton at the time of the first conversion, and only $10 per ton at the time of the second conversion, that the basis for estimating damages would be $50 per ton as to the first and only $10 per ton as to the last. This is common sense and justice to say the least. I see no reason why the rule does not apply in a patent case where two different uniform license fees for the same rights have prevailed for two different periods of time, respectively, and infringements have taken place during each of said periods. See Rude v. Westcott, 130 U. S. 165, 9 Sup. Ct. 468, 32 L. Ed. 888. This is peculiarly true when a different party controlled the patent and the granting of licenses and the fixing of the fee during each period. We are getting at damages for infringements at different periods of time and under different circumstances, and the established and uniform license fee is used as a basis for estimating the damages. Hence the uniform license fee prevailing at the time of each infringement controls the damage, and this is the rule when applicable at all as the basis. "It is a general rule in patent cases that established license fees are the best measure of damages that can be used." Clark v. Wooster, 119 U. S. 322–326, 7 Sup. Ct. 217, 219, 30 L. Ed. 392.

In Rude v. Westcott, 130 U. S. 152, at page 165, 9 Sup. Ct. 463, at page 468, 32 L. Ed. 888, the court said:

"It is undoubtedly true that where there has been such a number of sales by a patentee of licenses to make, use, and sell his patents, as to establish a regular price for a license, that price may be taken as a measure of damages against infringers. That rule was established in Seymour v. McCormick, 16 How. 480, 14 L. Ed. 1024, and affirmed in Corporation of New York v. Ransom, 23 How. 487, 16 L. Ed. 515; Packet Co. v. Sickles, 19 Wall. 611, 617, 22 L. Ed. 203; Birdsall v. Coolidge, 93 U. S. 64, 23 L. Ed. 802; and Root v. Railway Co., 105 U. S. 189, 197, 26 L. Ed. 975. Sales of licenses, made at

periods years apart, will not establish any rule on the subject and determine the value of the patent. Like sales of ordinary goods, they must be common —that is, of frequent occurrence—to establish such a market price for the article that it may be assumed to express, with reference to all similar articles, their salable value at the place designated. In order that a royalty may be accepted as a measure of damages against an infringer, who is a stranger to the license establishing it, it must be paid or secured before the infringement complained of; it must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention; and it must be uniform at the places where the licenses are issued."

In this case the granting of licenses was sufficiently frequent, and the price charged therefor was sufficiently uniform. There was sufficient reason for making the rate to engravers $15 and the rate to newspapers only $12 per week. The rate to the class of licensees to which this infringer belonged was absolutely uniform for each period of time. The number of persons who took licenses was sufficient to indicate acquiescence in the reasonableness of the royalty fixed and charged. True, the evidence is that time and the experience of others convinced the Waterproof Company it would do better and make more money should it reduce the royalty, which it did, but this fails to disprove that such a number of persons engaged in the business and took licenses at the figure given as to indicate a general acquiescence in the reasonableness of the royalty charged.

Whether the evidence shows that the patented process was used by defendant in making "all" the half tone plates for certain parties within a certain time, I regard as immaterial. The evidence shows it was used in making substantially all. The evidence was express that the defendant destroyed all file proofs of their use of the infringing process prior to the commencement of the accounting, but this was not done for purposes of concealment, or to destroy evidence. It was customary and done in the usual course of its business. I think that the complainants made more than a prima facie case of damages. They have shown that defendant used the patented method and processes without a license at times when regular and uniform royalties were fixed and licenses were being granted, and took business away from complainants' licensees who were to pay complainants a percentage of the profits of the business. Clearly this damaged complainants. As defendant did not take a license when it ought to have done so and ought to have paid complainants, or their assignors, $309 therefor, it seems to me we have a reasonable basis. "Actual damages must be calculated, not imagined; and an arithmetical calculation cannot be made without certain data on which to make it." New York v. Ransom, 23 How. 487–488, 16 L. Ed. 515, approved Rude v. Westcott, 130 U. S. 167, 9 Sup. Ct. 469, 32 L. Ed. 888.

The complainants ask to have the damages trebled under section 4921, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3395]. That section provides that, in such a case as this, "the court shall have the same power to increase such damages, in its discretion, as is given to increase the damages found by verdicts in actions in the nature of actions of trespass upon the case." See Tilghman v. Proctor, 125 U. S. 148, 149, 8 Sup. Ct. 894, 901, 31 L. Ed. 664. Whether damages

shall be increased or not depends largely on the conduct of the defendant and the circumstances of the infringement. Was it willful or defiant, persisted in after knowledge and notice? Has the conduct of the defendant been unreasonable and unjustifiable in his light? The court cannot seize upon the fact that the damages which the complainants have been able to prove are small as an excuse for increasing them. As just seen damages must be proved. In this case defendant admitted its infringement. The president of the company says they ceased to infringe after the injunction was served. I do not find any preliminary injunction. If there was none, and my attention is not called to any, then defendant continued to infringe after suit brought. The master so finds. It has not suppressed, concealed, or destroyed evidence. Its books were produced in court when called for. I find no evidence that the defendant kept its books in the form they did to conceal or suppress evidence. The reason for not keeping more comprehensive books—books showing the business more in detail—is fully given. Mr. Eggers, the president of the company, says that during a portion of the time they had no clerical force—kept no cashbook when they had no bookkeeper. I do not see that this is improbable; on the contrary it is quite probable. As to the file proofs and their destruction Mr. Eggers said:

"Q. Did you keep any file proofs of these etchings? A. We kept them a month and then threw them away." And: "Q. And the file proofs of such work have been destroyed? A. We never keep file proofs of any work; that is, past a month or two until the account is paid and checked up. I believe that is the general custom in the trade, with everybody."

The defendant did not appear when proofs were taken. After the interlocutory decree and when a sworn account was called for defendant practically denied infringement, and claimed to show, and did give evidence tending to show, that the patented process had been used for years before the patent was applied for. However, that is no defense now on the question of damages. It would seem that defendant knew or had reason to believe it was infringing as the records show it was called upon to indemnify at least one party with whom it was dealing, and from whom it secured business by a reduction of price, thus knowingly taking business from a licensee of complainants. The account rendered before the master was hardly a frank and full statement. On the whole I think a proper case has been made for increasingly the damages, and they will be trebled accordingly. Topliff v. Topliff, 145 U. S. 174, 12 Sup. Ct. 825, 36 L. Ed. 658; National F. B. & P. Co. v. Robertson's Estate (C. C.) 125 Fed. 524.

The defendant will also pay the master's fees and all the costs and expenses connected therewith usually allowed in such cases. The master's report will be modified as suggested, and, as modified, confirmed, as I do not find anything in the evidence to suggest that had the defendant taken a license, when it first infringed, at $15 per week, it would have been for such a time as to cover that infringing period when the rate of $3 per week was the established and uniform fee—commencing December 1, 1904, and ending February 6, 1905—the evidence being that licenses were invariably taken for short periods of time. It seems to me clear that for such time the defendant can

only be held at $3 per week, as his second period of infringement commenced long after the $3 rate had been established. As the other infringement was continuous and ran into the $3 period, I think defendant should be held to the $15 rate so long as his first infringement continued.

There will be a final decree accordingly.