## MASON v. GRAHAM.

1. The patent of E. H. Graham, of October 16th, 1860, reissued May 28th, 1867, for "picker-staff motion in looms," has no relation to the mere form of a journal-bearing arm, nor does it consist in arranging a journal-bearing arm in a slot in the rocker. It embraces every combination of a rocker with a bed and loose journal-bearing arms, arranged so as to produce the result described in the specification as effected by the combination.

2. Inasmuch as the defendant (who was alleged to infringe this invention of Graham) employed a combination of a rocker with a bed by loose journals projecting on each side the picker-staff, and the combination was effected by means of a journal-bearing arm, it was *held*, to be unimportant that the form of his journal-bearing arm was unlike that of the complainant's, or that its mode of attachment was different, so long as it performed the same function in substantially the same way.

3. Where the defendant had been in the habit of selling the infringing picker-staff motion both separately and in a form where they were attached to looms, regard should be had, in ascertaining his profits upon those sold with the looms, to his profits upon those sold separately rather than to the aggregate profits made by him upon the loom and attachment combined.

4. If a defendant has cheapened the cost of producing the infringing device by an improvement of his own, he is entitled to a corresponding credit in the ascertainment of the profits, which a complainant is entitled to recover.

5. After an interlocutory decree and reference to a master in a suit against M., a manufacturer and seller of infringing machines, the owners of the patent commenced proceedings against persons who *used* machines made and sold by M. M. thereupon, to protect his customers, paid the patentees a sum fixed upon, under a written agreement that the payment should be "in full satisfaction of our right to collect back damages for past infringement" by M.'s customers, and a license fee for the future use of all the machines sold by M.; but the agreement contained a proviso that this settlement should "not affect *in any manner* our right to recover profits or damages" from M., and that the suit against M. "shall proceed *precisely* as if this settlement had never been made." *Held*, that the amount paid to the patentees by M. was properly excluded by the master as a credit in computing profits made by M.

APPEAL from the Circuit Court for the District of Massachusetts, in which court E. H. Graham filed a bill against one Mason for injunction and account; the bill being founded upon letters-patent for an "improvement in picker-staff motion for looms," granted to him, October 16th, 1860, and reissued May 28th, 1867; which patent and reissue the bill alleged that a machine of Mason, the defendant, infringed.

The object of the invention patented to the complainant was to produce an accurate and sure picker-staff motion in looms by a combination of devices, which, while giving great accuracy of motion, should so guide and hold the picker-staff as to enable it to work with the least possible friction and lateral disarrangement, commonly called "wabbling."

In all picker-staff motions it is desirable, if not essential, that the end of the staff made to strike the shuttle should move in a right line, so as to drive the shuttle directly along the shuttle-race in the line in which it is desired to play.

This has been effected by constructing the lower end of

the staff in the form of a rocker, the exterior curve of which is an arc of a circle described from a centre corresponding with that point in the staff that strikes the shuttle. This rocker is made to roll on a bed, the face of which is extended parallel to the shuttle-race, and which is placed on the outside of the loom beneath the lay. How to connect the rocker with the bed, so that the picker-staff may be maintained in proper position upon the bed, had been a subject of much inquiry. Various modes had been suggested before the complainant obtained his patent, and several of these modes had been described in patents for improvements in looms granted to other inventors.

The invention of *Graham*, the complainant, is shown in the following drawings:

FIG. 1.

This figure represents a vertical central longitudinal section through so much of a picker-staff and its appurtenances, embracing the said improvements, as is necessary to illustrate the invention.

Figure 2, upon the following page, is a perspective view of same.

FIG. 2.

Figure 3 represents a central longitudinal horizontal section through the retracting spring of the picker-staff and its cylinder

FIG. 3.

Figure 4 is a plan or top view of Figure 1.

FIG. 4.

The description in the reissue was thus:

"In these figures, *a a* represent a curved rocker, in the socket *b b*, of which the picker-staff is to be fastened. The rocker *a a* plays upon a horizontal bed, *c c*, having a socket *d*, through which the shaft of the loom passes in the usual way. The shank, *e e*, of the rocker, *a a*, is made hollow, or with a suitable box or bearing, *f f*, into which a shaft arm or bar, *g g*, is inserted, which arm, by means of journals projecting on each side thereof, has

a bearing in the eyes, *i i*, formed in the bed-piece, *c c*. By this arrangement, the rocker (in its reciprocating movement) is kept perfectly true in its bearings by the arm or bar, *g g*, which holds the rocker, *a a*, truly in position, in consequence of its long bearing therein; and as the arm or bar, *g g*, also oscillates freely upon its journals, *h h*, which further serve to steady the rocker laterally, the rocker moves with the least possible friction, and with the greatest accuracy, so that the wear and tear is necessarily but very slight. The eyes or bearings, *i i*, have inclined slots (shown in dotted lines in Figure 1) cut in them, so as to form ears or open boxes in which the journals, *h h*, are inserted when the parts of the picker motion are put together. By this means, the shaft or arm, *g*, and its journals, *h*, can readily be removed and replaced, and are free to play without liability to work out of their bearings. The rocker, *a a*, is retracted by means of a spiral spring, *k k*, wound loosely around a short shaft, *l*, and attached at one end to a plate, *m*, which turns freely on the shaft, *l*. A strap, *n*, attached to the plate, *m*, fits over a hook, *o*, on the under side of the rocker, *a a*. As the spring, *k k*, is liable to partially lose its force by the motions of the rocker, *a a*, this contingency is provided for by forming in the plate, *m*, a series of holes, *p p*, into which successively one end of the spring, *k k*, is set, as fast as it loses its elastic force, whereby the spring can be set up at pleasure, and its force graduated without the necessity of frequent repairings or renewals."

The reader thus sees that the invention described is primarily a combination of a rocker with a bed by means of loose journals projecting on each side of the picker-staff, and arranged beneath it substantially as described in the specification. As in other arrangements for picker-staff motions, the rocker is made to play upon a horizontal bed, parallel to and below the shuttle-race, and the bed has a socket passing longitudinally through its base, for the passage of the shaft of the loom. The shank of the rocker is made hollow, that is, with a box or bearing extending through its tread upward, into which a shaft-arm or bar is inserted. This bar or shaft-arm is fitted with journals projecting on each side at right angles with the rocker, and resting in eyes formed in the bed-piece, which constitute the journal bearings. The

eyes have inclined slots cut in them, so that they form ears, or open boxes, into which the journals are inserted when the parts of the picker-stiff motion or the constituents of the combination are put together. Thus the shaft and the journals can readily be removed and replaced, and the journals are free to play without working out of their bearings. The rocker is retracted and caused to move by means of a spiral spring, wound loosely around a short shaft below the bed, and attached at one end to a plate which turns freely on the shaft; and the plate is connected by a strap with a hook extending from the under-side of the rocker, or the lower end of the shaft-arm.

The reissue continued:

"The first part of this invention relates to the position of the journals. This position is determined by the position of the socket for the picker-staff, which socket is so placed that the point of the picker-staff which strikes the shuttle must move in the required line; and this part of the invention consists in placing the journal at or near this socket, and as near the level of the bed as practicable. In this position there is the least possible wear, and the journals perform all their functions to the best possible advantage. It is obvious that as every point upon the rocker varies its position in the action of the motion, with reference to the bed, it is impossible to connect the journal directly with the rocker and its box directly with the bed, or *vice versa*. One or the other must be indirectly connected, and it is for this reason that in the motion described the journals are placed upon the arm *g*, upon which the rocker can play up and down. So far as we know, no rocker has ever been combined with its bed by means of journals before this invention."

"The second part of this invention consists in forming the boxes or bearings for the journals with such an opening that the journals may be laid in them in putting the motion together, without liability to work out in the operation of the rocker, as plainly shown in the drawings. This method of construction is much cheaper than making the boxes cylindrical, and is quite as efficient in every respect."

The claims of the reissue were as follows:

"1st. The combination of a rocker of a picker-staff with its

bed, by loose journals, projecting on each side of the picker-staff, and arranged beneath the picker-staff, substantially as described.

"2d. In combination with the rocker, the bed and the journals, the open boxes, substantially as and for the purpose described.

"3d. In combination with the rocker and its bed, the journal-bearing arm, operating substantially as and for the purpose specified."

The devices of *Mason* (the defendant) are shown in perspective in Figure 5; and a vertical section, in central plane, of the rocker, is shown in Figure 6.

FIG. 5.

FIG. 6.

These drawings were thus described in the defendant's patent: ·

"*A* represents the rocker-bed, cast with a socket, *a*, at one end, by which it is attached to the loom. The upper surface on which the rocker works is, as usual, straight, in the direction of the length, but in the cross-section it is made concave, of a V-shape, to within a short distance of the outer end, where it is formed with a cross semi-cylindrical box, *b*, to receive one end of a link, to be presently described; and near the middle of its length it is formed with a vertical mortise, *C*, through which the stem of the rocker passes, and in which it plays freely.

"The rocker, *B*, longitudinally is, as usual, in the form of a segment of a circle, but in the cross-section it is of an inverted V-shape, to fit the concave of the bed. It has a short stem or arm, *d*, which extends through the mortise, *c*, in the bed, and by which it is, as usual, connected with a spring for drawing back the picker-staff. The upper part is suitably formed with an open socket, *e*, to receive, and in which is secured by a screw-bolt, *f*, the lower end of the staff, *g*. Back of the socket, *e*, it is formed with a cross semi-cylindrical box, *h*, like the one, *b*, at the outer end of the bed, *A*.

"There is an open link, *c*, consisting of two cylindrical journals, *i i*, connected by side-bars, *J J*. One of the end journals fits and works in the semi-cylindrical box, *b*, at the outer end of the bed, *A*, and the other in the semi-cylindrical box, *i*, of the rocker. As the tension of the usual spring attached to the arm, *d*, of the rocker tends to draw the rocker in the direction of the arrow, the link, *c*, keeps it in its right place on the bed, and by reason of its end journals working in the semi-cylindrical boxes, permits the required rocking motion to take place freely, whilst at the same time the form of the upper surface of the bed, and of the under surface of the rocker, prevents the picker-staff from wabbling or moving sidewise.

"By the mode of construction above described, I am enabled to make the whole structure of three pieces, the bed, *A*, the rocker, *B*, and the open link, *c*, each of which can be readily cast, and the three put together and used without any finish beyond the usual cleaning operation to which castings are subjected."

The claim of *Mason* was as follows:

"The bed, formed with a V-shaped groove, and the rocker, with its under surface of the corresponding form, in combination

with the open link, by which the rocker is kept in place on the bed, substantially as and for the purpose set forth."

It was not disputed that the defendant's machine was the same as that described in the complainant's patent, in these respects, viz.:

1. Each consisted of three main parts, the rocker, the bed, and a third piece whose office it was to hold the rocker properly upon the bed.

2. The rocker and the bed were the same in each.

The principal question for consideration of the court below was: Whether the device for holding the rocker upon the bed in the defendant's machine was the substantial equivalent of the corresponding device in the complainant's machine?

These devices in each machine were described as follows:

*In the complainant's machine* the rocker, *a*, in its reciprocating movement, was kept true in its bearings by the arm or bar, *g*, which held the rocker in position; the bar, *g*, oscillated upon its journals, *h h*. The eyes or bearings for the journals had inclined slots, *i*, cut in them, so as to form open boxes, in which the journals were inserted.

*In the defendant's machine* there was an open link, *c*, consisting of two cylindrical journals, *i i*, connected by side-bars, *J J*. One of the end journals fitted and worked in the semicylindrical box, *b*, at the outer end of the bed, *A*, and the other in the semicylindrical box, *i*, of the rocker. As the tension of the usual spring attached to the arm, *d*, of the rocker tended to draw the rocker in the direction of the arrow, the link, *c*, kept it in its right place on the bed, and by reason of its end journals working in the semicylindrical boxes, permitted the required rocking motion to take place freely.

One of the defences—one, however, not much pressed—was that the invention of the complainant, Graham, had been anticipated by prior devices.

Of these four only need be noticed. They were described in the earlier patents granted to Benjamin Lapham, to David Barnum, to Renselaer Reynolds, and to William Stearns.

While each of these had a rocker and a bed, no one connected the rocker with the bed by means of loose journals, or by loose journal-bearing arms, and no one of them obtained the beneficial results secured by the invention belonging to the complainant. In Lapham's invention there was one journal on the bed and one on the rocker, both on the same side of the picker-staff; a device which obviously could not prevent wabbling, or the sliding of the rocker on the bed. Barnum's invention had no journals, journal-boxes, or journal-bearing arms. Nor had the device of Stearns. In the Reynolds patent the rocker was described as held to the bed by means of a strap fastened at one end to the under face of the rocker, and at the other to a point in the groove of the bed-piece, in which the rocker rolled.

The defendant referred to the four patents above mentioned as exhibiting the state of the art when the complainant's patent was granted, and as requiring that patent to be construed to cover only a combination, of which a journal-bearing arm sliding vertically in a hollow place or box in the rocker, and having journals which turn in open boxes in the bed-piece, is an essential constituent.

The court below held that the invention of Graham had not been anticipated by any of the devices relied on to show anticipation; that the patent of the complainant was infringed by the machine of the defendant, and a decree was entered ordering the defendant to account, and referring the case to a master to state an account.

This decree and reference was made on the 9th of June, 1869.

The master reported that the defendant had made and sold 3639 pairs of the infringing motions as a part of looms manufactured in his establishment, and that the profits resulting from the manufacture and sale of such motions had mingled with the profits from the manufacture of looms:

That the cost of making the looms, including the motions, was $59.63:

That the cost of making the motion was 45½ cents each, or 91 cents for each loom:

That the profits resulting from the manufacture of each loom, including the pair of motions, was $5.64.

Assuming these to be the facts, the appellant insisted that he should have been charged with only $8\frac{6}{10}$ of a cent as the profit made by him on each pair of motions, that bearing the same proportion to $5.54, the whole profit on the looms, which 91 cents, the cost of a pair of motions, bears to $59.63, the cost of the entire loom with the motions. This view the master refused to take.

It appeared further, from the master's report, that the defendant sold 414 pairs separately from the looms at $2 per pair, and $297\frac{1}{2}$ other pairs for $534.75.

It appeared, however, from the report that the defendant made the infringing motions after a pattern of his own devising; that they cost 50 cents per pair less than the pickerstaff mechanism, which he had immediately before put upon his looms; that they were made under a patent granted to him, and that they cost about 50 cents less than the motions made by the complainant, the difference in the cost being due to his invention.

It seemed, also, that the cost of making "beds" and "rockers," which were used in the repair of bridle-motions previously made, had been reduced by the defendant; the defendant's bed costing but $27\frac{2}{10}$ cents, and his rocker but $12\frac{4}{10}$ cents, whereas those of the complainant cost, the bed 42 cents and the rocker $19\frac{2}{10}$; the reduction obtained by the defendant being due in part to the fact that the labor required in putting together the arm and rocker in his motion was less than in putting them together in the complainant's.

The report charged the complainant with—

3639 pairs bridle-motions, sold on looms to sundry parties at a
    profit of 50 cents per pair, . . . . . . . $1819 50
The profit derived from the sale of the 414 pairs of mo-
    tions, sold separately from the looms, at $2 a pair, . $828 00
Less cost of producing at 91 cents per pair, . . . 376 74
                                      ————— 451 26

It charged him also with the sale of the

$297\frac{1}{2}$ motions sold separately from the looms, . . $534 75
Less cost of producing at 91 cents per pair, . . . 271 75
                                      ————— 263 00

The master also charged the defendant as follows :

| | | | |
|---|---|---|---|
| 346 beds (parts of bridle-motions), sold at various prices, amounting in all to . . . . . . . | . $313 00 | | |
| Deduct cost at $27\frac{2}{10}$ each, . . . . . . . | . 94 11 | | |
| Profit, . . . . . . . . . . . . . | | . $218 89 | |
| 1548 rockers (parts of bridle-motions), sold at various prices, amounting in all to . . . . . . . | . $768 70 | | |
| Deduct cost at $12\frac{4}{10}$ each. . . . . . . | . 191 95 | | |
| | | 576 75 | |
| | | $3329 40 | |

On the hearing before the master the defendant sought to
reduce the damages found by him by the introduction of a
paper, admitted to be genuine and signed by the com-
plainant. The paper was given under these circumstances :
Graham, the complainant, had obtained injunctions against
certain mill companies who had bought their motion from
Mason, the defendant, *he, Mason, having guaranteed them
against disturbance by Graham.* Graham, the complainant,
was about to apply for injunctions against other purchasers
from Mason, who had purchased and were holding in the
same way. And Mason, acting really in behalf of the per-
sons using the motions, and in a certain sense as their agents,
rather than as representing himself alone, had paid the $1000
mentioned in the paper to protect them from all claims of
Graham. The bill in the case had been filed in June, 1867,
and as already said, the decree was made June 9th, 1869 :

" BOSTON, October 25th, 1869.

" Received of William Mason, of Taunton, $1000 in full satis-
faction for our right to collect back damages for the past in-
fringement of reissue letters-patent of May 28th, 1867, for picker-
staff motions, *by the individuals and corporations who have used
bridle-motions of Mr. Mason's make,* and as tariff for the future use
of *such* motions. It is understood and agreed that the number
of these motions does not exceed five thousand four hundred
and fifty-one, and that Mr. Mason is to furnish us with a list of
the names of the users and the number sold by him to each, and
that the bridle-motions enumerated in that list are all hereby
licensed. This bridle-motion is the motion that has been pat-

ented by Mr. Mason. It is also understood and agreed that this settlement does not affect in any manner our right to recover profits or damages *from Mr. Mason* for his infringement of said patent, and that the suit of *Graham et al.* v. *Mason* shall proceed *precisely* as if this settlement never had been made. It is also understood that this agreement relates simply and solely to the bridle-motion, and no other, and licenses simply those bridle-motions of Mr. Mason's make not already licensed, and no others.

"E. H. GRAHAM,
"W. MASON."

Mason, the defendant, insisted that this $1000 should be added to the cost of the " bridle-motions," or in some way applied to reduce the amount of profits which should be found resulting from the manufacture. But the master refused to allow him any benefit from this payment. The master said:

"The money was paid by the defendant after the decree was passed in the case. It forms no part of the cost of manufacturing the 'bridle-motions' and cannot be here considered in reduction of the amount found as profits of manufacture. If this is a payment on account of the sum to be ultimately adjudged against the defendant in this case it is not within the matter submitted to the master by the decretal order."

The court below affirmed the report of the master, and a final decree being entered this appeal was taken from the same.

*Mr. Benjamin Deane, for the appellant; Mr. J. E. Maynadier, contra.*

Mr. Justice STRONG delivered the opinion of the court.

By the arrangement described in Graham's reissued patent of 1867, and claimed as his invention, it is manifest that that part of the device called the rocker is prevented from sliding perceptibly on its bed and is kept true in its bearings by the arm or bar from which the journals are projected, the arm having also a long bearing in the box of the rocker. The journals, moreover, having bearings in the ears of the

bed, steady the rocker, resist any lateral movement, and prevent what is denominated as wabbling. As the picker-staff is made to oscillate, its rocker rises and sinks upon the arm, and thus most of the friction caused by the play of the staff comes upon the shaft, or journal-bearing arm, and not upon the tread of the rocker or the bed-plate.

We think the invention has no relation to any mere form of a journal-bearing arm. Nor do we think it consists in arranging a journal-bearing arm in a slot in the rocker. In our opinion it embraces every combination of a rocker with a bed and loose journal-bearing arms, arranged so as to produce the result described in the specifications as effected by the combination.

And we have been unable to perceive that the invention was anticipated by any of those devices which the defendant has given in evidence. We do not propose to go into any critical examination of them. The case does not call for it. Of them all it may be said that while each has a rocker and a bed, no one connects the rocker with the bed by means of loose journals, or by loose journal-bearing arms, and no one of them obtains the beneficial results secured by the invention belonging to the complainants. It is but faintly claimed, if at all, that any of these patents describe the invention of the complainants. The defendant has used them rather as exhibiting the state of the art when the re-issued patent in question was granted, and as requiring that patent to be construed to cover only a combination, of which a journal-bearing arm sliding vertically in a hollow place or box in the rocker, and having journals which turn in open boxes in the bed-piece, is an essential constituent. We think, however, they exhibit no such state of the art as requires that construction to be given to the patent, and we cannot perceive that such a construction is justified by the language of the specification and claims.

We come, then, to the inquiry whether the devices made and sold by the defendant are substantially the same as those patented by the reissued patent; or, in other words, whether the picker-staff motion made and sold by the defendant is

an infringement upon the complainants' right.   Upon this question the opinions of the experts examined are in direct conflict, and we are, therefore, under the necessity of comparing for ourselves the two devices.   We have already said that the object sought to be accomplished by the complainants' invention was the prevention of wabbling of the picker-staff, and compelling it to move steadily, without lateral deflection, in the required plane.   It is not denied that exactly this is the object at which the defendant's motion is aimed.   It remains, then, only to determine whether the means by which the intended result is obtained are substantially the same.   That both the combinations connect a rocker to its bed by journals indirectly, employing an arm to effect such indirect connection, is made clear by inspection.   In Mason's motion the arm is attached by a second journal, in the complainants' by a slot in the rocker.   It is true the form and the location of the arms differ, but they perform the same functions, and in substantially the same manner.   Both are journal-bearing arms.   Both connect the journals, whether they are on the rocker or on the bed, indirectly with the bed in the one case, or with the rocker in the other.   Each, then, is a combination of a rocker with a bed, by loose journals projecting on each side of the picker-staff, and the combination is effected by means of a journal-bearing arm.   That the form of the journal-bearing arm of the defendant's motion is unlike that of the complainants', or that its mode of attachment is different, is immaterial so long as it performs the same function in substantially the same way.   We are, therefore, of the opinion that the defendant's picker-staff motion must be considered as practically the same as that patented to the complainants, and, therefore, that the charge of infringement is sustained. The Circuit Court then correctly ordered that the defendant should account.

But we think there was error in the ascertainment of the profits with which he was charged.   The master to whom the statement of the account was referred reported that the

defendant had made and sold 3639 pairs of the infringing motions as a part of looms manufactured in his establishment, and that the profits resulting from the manufacture and sale of such motions had mingled with the profits from the manufacture of looms. He further reported that the cost of making the looms, including the motions, was $59.63; that the cost of making the motion was 45½ cents each, or 91 cents for each loom; and that the profits resulting from the manufacture of each loom, including the pair of motions, was $5.64. Assuming these to be the facts the appellant insists that he should have been charged with only $8\frac{6}{10}$ths of a cent as the profit made by him on each pair of motions, that bearing the same proportion to $5.54, the whole profit on the looms, which 91 cents, the cost of a pair of motions, bears to $59.63, the cost of the entire loom with the motions. To this we cannot assent. It appears from the master's report that the defendant sold 414 pairs, separately from the looms, at $2 per pair, and 297½ other pairs for $534.75. These sales furnish a much better measure of profits than is a ratable proportion of the profits on an entire loom. It may fairly be presumed from them that the profits on the sale of looms, with the motion attached, were increased by the infringing device quite as much as was the profit on the motions sold separately. It does not appear at what profit, if any, the looms could have been sold without the picker-staff motion attached.

But the master further reported that the defendant made the infringing motions after a pattern of his own devising; that they cost per pair 50 cents less than the picker-staff mechanism which he had immediately before put upon his looms; that they were made under a patent granted to him, and that they cost about 50 cents less than the motions made by the plaintiffs, the difference in the cost being due to his invention. If this is so, it is clear that the 50 cents saved on each pair, equivalent to 50 cents profit, is not due to the complainants' invention. Were it not for the defendant's improvement the cost of making a pair of motions would have been, not 91 cents, but 91 plus 50 cents, or

$1.41, and the profits on each pair would have been 59 cents, instead of $1.09 charged to the defendant. Manifestly the complainants are not entitled to the savings or profits resulting from the defendant's own invention.

The defendant, therefore, has been charged by the master's report, confirmed by the court, too much for the profit derived from the sale of 414 pairs of motions sold separately from the looms, and from the sale of $297\frac{1}{2}$ motions also sold separately from the looms. For the former he should have been charged $243.26, instead of $451.26, and for the latter $175.52, instead of $263.

We think, also, that the defendant has been excessively charged for the profits made by him on the 346 beds, and the 1548 rockers sold by him at various times for the repair of bridle motions previously made. He has been credited with the cost only, without reference to the fact that the cost was reduced by his own invention. The complainants have not shown how much the cost would have been had the defendant made them without employing his own improvements. Under such circumstances it appears just to assume that but for the improvement of the defendant the cost of making the bed would have been 42 cents instead of $27\frac{2}{10}$, and the cost of making the rockers would have been $19\frac{2}{10}$ cents instead of 12 cents and 4 mills, as reported by the master. The consequence of this is that the profit on the 346 beds sold was only $167.68, and the profit on the 1548 rockers sold was only $471.49.

The decree, therefore, should have been in favor of the complainants for

| | | |
|---|---|---|
| 1st. Profits on bridle motions sold on looms, . | . | $1819 50 |
| 2d. Profits on 414 pairs sold separately, . | . | 243 26 |
| 3d. Profits on $297\frac{1}{2}$ pairs sold separately, | . | 175 52 |
| 4th. Profits on the beds sold, . . . | . | 167 68 |
| 5th. Profits on the rockers sold separately, | . | 471 49 |
| Total, . . . . . | . | $2877 45 |

A majority of the court is of opinion that the appellant is not entitled to a credit for the $1000 paid on the 25th of October, 1869, for which a receipt was then given.

The decree of the Circuit Court is REVERSED, and the case is remitted with instructions to enter a decree in favor of the complainants against the defendant for $2877.45, with costs of suit in the court below. Each party to pay his own costs in this court.

REVERSAL AND REMAND ACCORDINGLY.