## LEE v. MALLEABLE IRON RANGE CO.

### In re BECKWITH'S ESTATE.

(District Court, E. D. Wisconsin. January 15, 1918.)

1. PATENTS ⬭318(6)—INFRINGEMENT—ACCOUNTING FOR PROFITS.

That an infringer, during the time of infringement, substituted pressed steel plates for malleable cast plates, which it had previously used in making one part of the infringing structure, thereby effecting a saving in cost and increasing its profits, does not entitle it, on an accounting for profits, to deduct the amount of such saving, but its liability is for the profits actually made.

2. PATENTS ⬭318(6)—INFRINGEMENT—ACCOUNTING FOR PROFITS.

An infringing manufacturer paid to its sales managers, in addition to their salaries, a commission on the account of their sales, including the infringing article. *Held* that such payments were essentially a division of profits, and that on an accounting for profits of the infringement no part of the amount could be deducted as a part of the cost of manufacture.

3. PATENTS ⬭318(6)—INFRINGEMENT—ACCOUNTING FOR PROFITS.

An infringer, which both manufactured and sold the infringing article, on an accounting for profits, is not entitled to a deduction, in addition to all proper allowances for cost of manufacture, of a manufacturer's profit.

4. PATENTS ⬭318(3)—INFRINGEMENT—ACCOUNTING FOR PROFITS.

Where expert accountants have accurately determined from the books of an infringer the profits actually made by the manufacture and sale of the infringing article, the court cannot safely apply the standard of comparison rule, by undertaking to estimate what profits would have been made upon some other open form of the structure, which defendant might have made, but did not.

5. PATENTS ⬭318(3)—INFRINGEMENT—ACCOUNTING FOR PROFITS—RELEVANCY OF EVIDENCE.

An established profit upon an "open" structure, which may be attributed to a variety of causes, cannot be made the basis for an inference that an equal profit on a patented structure was not attributable to the invention.

6. EVIDENCE ⬭595—INFERENTIAL FACTS.

The susceptibility of a fact to produce an inference must be denied, when the probative force or effect of that inference may be wholly frustrated at the option of the one to be affected by it.

7. PATENTS ⬭319(1)—INFRINGEMENT—RIGHT TO DAMAGES.

The law does not attempt in advance to enumerate with precision the circumstances under which a patent owner may be substantially damaged by infringement, but the right to damages, substantial or nominal, depends upon the proof in the particular case.

8. PATENTS ⬭319(1)—INFRINGEMENT—DAMAGES RECOVERABLE.

In finding a "reasonable" royalty, as a basis for computing damages for infringement, the degree to which the infringement has been profitable or unprofitable to the infringer cannot be a controlling factor, but it is to be determined on all available pertinent proofs.

9. PATENTS ⬭319(3)—DAMAGES FOR INFRINGEMENT—INCREASE BY COURT.

Evidence that defendant, on examining a new patented improvement in an article which it manufactured, at once appropriated the invention and refused to cease infringement until compelled at the end of long litigation, and that pending the suit it unsuccessfully attempted, through one of its officers, to obtain a patent for itself embodying all of the essential features of complainant's invention, with only colorable changes, *held* to render it proper for the court to increase the damages awarded for the infringement.

⬭For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10. EVIDENCE ⊚⟶99—"RELEVANCY."

The test of "relevancy" of evidence is that an evidentiary fact can be considered as admissibly relevant only when the desired conclusion based upon it is a more probable or natural, or at least a probable or natural hypothesis, and when the other hypothesis or explanations of the fact, if any, are either less probable or natural, or at least not more probable or natural.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Relevancy.]

In Equity. Suit by Fred E. Lee, administrator of the estate of Arthur K. Beckwith, deceased, against the Malleable Iron Range Company. On exceptions to report of special master. Modified and confirmed.

Harry C. Howard and Fred L. Chappell, both of Kalamazoo, Mich., for plaintiff.

Banning & Banning, of Chicago, Ill., and Arthur L. Morsell, of Milwaukee, Wis., for defendant.

GEIGER, District Judge. The case is before the court upon the decision and report of the special master under the decree for an accounting in respect of gains, profits, and damages. The many years of the litigation need not be reviewed, and the questions raised upon exceptions to the report, though important, are few in number and within quite narrow compass. The record before the master, while involving much in the way of figures, now presents no matter requiring re-examination of details, nor review of calculations in which such details are essential to produce items about which there is controversy. It is therefore possible to proceed directly to a consideration of the facts presenting questions exhaustively argued by counsel on both sides. The parties are in accord upon the fundamental fact that the accounting must be concerned with the manufacture and sale by the defendant of approximately 47,290 structures embodying the patent, between April 18, 1905, and April 18, 1911. It will suffice to begin with the defendant's statement of account respecting their manufacture and sale. At the outset the gross sales are declared to aggregate $299,704.08. Against this the following credits are claimed:

(1) Cost of materials required.................................$152,003.06
(2) Cost of labor.............................................. 37,264.87
(3) Saving in cost of manufacturing part of combinations......... 15,138.79
(4) Proportional amount of expenses, losses, etc................. 76,456.44
(5) Manufacturer's profit....................................... 20,239.97

Total ...................................................$301,103.13

On its face, the statement, therefore, shows a loss of $1,399.05.

The great prosperity of defendant's business as a whole, during the infringing period, exhibited, among other things, by dividends varying from 15 to 50 per cent. upon a capital stock of $100,000; total profits during the period of $737,374.36; commission salaries to certain officials, during the period, of $207,486.94; a great increase of net sales and an increase of average profit per range from $2.95 to $8.56, during

the same period—all these facts led the master to view with skepticism the account presented; and he was justified in this, not merely by the figures just referred to, but by the very act of the defendant, during these years, of incorporating in its structure, as an important feature of it, the patented combination which has given rise to these years of strenuous litigation involving its legal merit. As against such an array of facts, testimony of witnesses ascribing but minor importance to an invention to which the court had by its judgment accorded real merit was of necessity given, not only cautious, but rather scant, consideration by the master; and he properly proceeded at once to test the account in respect of its claim to credits upon the objections made thereto by the claimant. The consideration was addressed to these items:

First. The third credit, "Saving in cost of manufacturing part of combinations, $15,138.79."

Second. Parts of the fourth credit, $76,456.44, as relating to commission salaries, depreciation, and interest on capital invested.

Third. The fifth credit, $20,239.97 as "manufacturer's profit."

These will be considered in the order stated:

[1] The evidence discloses that initially, and in approximately 7,002 infringing combinations first made, defendant used malleable cast heating plates. In the other approximately 40,288, later manufactured, it used pressed steel plates, for whose manufacture and preparation it installed the necessary machinery and appliances. These latter, so the proofs show, could be made and used at a cost less than the malleable plates by $15,138.79. It is urged that this saving or gain should be allowed to the defendant, as due to its thrift and foresight, and not to Beckwith's invention. It may be said that the position is not at all supported by Mason v. Graham, 23 Wall. 276, 23 L. Ed. 86, and for the reasons appearing in italicized words of an excerpt from the opinion in that case:

"But the master further reported that defendant made infringing motions *after a pattern of his own devising;* that they cost, per pair, 50 cents less than the Pickerstaff mechanism which he had immediately before put upon his looms; that *they were* made *under a patent granted to him;* and that they cost about 50 cents less than the motions made by the plaintiffs, the difference in the cost *being due to his invention.* If this is so, it is clear that the 50 cents saved on each pair, equivalent to 50 cents *profit,* is not *due to the complainant's invention.* * * * Manifestly the complainants are not entitled to the savings or profits *resulting from the defendant's own invention."*

Counsel suggests that the "principle of the matter" is not affected by the fact that "the pressed steel plate was *per se* never the subject of a patent"; that it could not affect the amount of saving, and "whatever saving was effected by the defendant in changing or improving its machinery and its methods of manufacture, at its own expense, something it was under no obligation to do for the benefit of the complainant, could in no way be attributed to, or be the result of, the patented invention, unless the patented invention itself inherently effected the saving."

Now defendant's thought of claiming a saving can be attributed to nothing other than its experience in first using the malleable cast plates; and the record suggests this query respecting defendant's at-

titude, had it always used the pressed steel plate; could it then contend that this $15,138.79 is not a part of its profit, because it or some one else might have made a more expensive plate? Or, if the evidence disclosed the converse situation—i. e., that defendant originally used pressed steel and later, at greater cost, malleable plates—could complainant urge that the former, and not the latter, cost be taken, to the end that a larger resultant profit be exacted? Or, again, suppose that, instead of using a "sheet steel metal reservoir," as an element of claim II, the defendant had used "copper"—and assuming equivalency of elements—could complainant ask that defendant account for its profits upon the basis of sheet steel, rather than upon the higher cost basis of copper, actually used?

In a sense, it may be true that a choice of pressed steel, or the saving effected thereby, is not attributable to the patent; neither is the original selection of malleable cast attributable to it. But either, if and when used for plates, embodies an element of the claim; and the query is not what was or is their relative merit or cost, but what, whichever was used, was its cost? It would be equally possible for an infringer to minimize his accountable profits by showing "savings" through reduction of high salaries to salesmen, or of expensive advertising in the later, as compared with the earlier, infringing period.

So, in Mason v. Graham, when it appeared that there was a "saving" attributable to a feature neither within the scope, nor an embodiment of, the patentee's right, he was not entitled to its benefit as a part of the profit. But, in the case before us, the use of either cast or pressed plates was in disparagement of the element of the claim and the plaintiff is entitled to recover the profit actually made on either or both, as used—unless, as above indicated, an infringer may drive the patentee to accept, not profits actually made, but such as might have resulted from manufacturing in the method most expensive and therefore productive of the minimum of profit. Of course, this may easily be carried to a point where a loss would always result. I think the master correctly ruled on this phase of the account, and exceptions thereto are overruled.

[2] The next question arises upon the so-called "commission salaries," claimed by defendant as an item of cost to be deducted. The amount is $13,376.47, and is asserted to be the proportion allotted to the infringing combinations out of an aggregate of $207,486.94 paid for the infringing period to defendant's three managers by way of compensation over and above regular salaries. The master conceived the situation to present, not a payment of salaries, but in reality a division of profits. The large amount, the terms of corporate resolutions for their contingent award, their progressive increase with increased profits, and their treatment as such dividends or division upon the books, are alone sufficient to support the master's view. The resolutions, if lawful, while authority for their ultimate payment, nevertheless placed no obligation upon the beneficiaries not already comprehended within their contracts for service at stipulated salaries. In my judgment, a good way to test out the status of these payments in respect of cost or profits is to consider whether defendant, as a man-

ufacturer, in endeavoring to make up a yearly budget upon any as-sumed volume of business, in any aspect of the matter, would have included these payments, or any estimate thereof, as an item of cost of manufacture. Obviously not. The arrangement or plan was but the introduction of the common co-operative idea between employer and employé, in which the former agreed to give and did give to the latter a percentage of profits, if and when earned. The exceptions to the master's ruling upon this item are overruled.

[3] The next item, which was the subject of the master's report, and his action whereon is sought to be reviewed upon exception, is a so-called "manufacturer's profit" of 10 per cent. incurred on cost of material, labor, depreciation, factory expense, and invested capital of $202,399.71. The difficulty in accepting the contention on behalf of the defendant in respect of this item arises through the practical con-cession that, howsoever it be termed, or upon what considerations it is attempted to be justified, it still remains a gain or a profit in the hands of one who, as the defendant in this case, was both manufacturer and seller. It may be true, as suggested, that if a patentee is not himself manufacturing the patented device, but procures another to make it, the latter must be paid an amount which will include what may be called the manufacturer's profit. There, however, arises the pre-cise distinction which exists between manufacturer with and with-out right—the distinction between a licensee and an infringer. And if the case be tested in the language of counsel:

"When, however, no contract has been made in advance, but the patentee elects to treat the manufacturer practically as his agent—as his agency, to use the words of the Supreme Court—by holding him as a trustee for the savings and profits that he may have made, due and attributable to the in-vention, he thus adopts or appropriates the manufacture done by the defend-ant, and should stand in the same position and condition in an accounting for profits as if he had hired him in advance to manufacture the goods for the market"

—there is no justification for treating the situation in any different way than by a simple ascertainment of the difference between cost and yield. It may be a common expedient, for one who both manufactures and sells, to include as an advance estimate a certain percentage covering the items referred to, largely by way of creating a safe margin beyond which the real manufacturer's profit is to be calculated. But, after the fact, there is no justification for dealing with such estimated margin as a sort of gain which is not in fact a gain. The very statement of the proposition treats it as such, and, in a case like the present, there is no reason why, if the manufacturing end is to have a margin of that char-acter, a like margin should not be credited to the selling end. If one who makes is entitled to a gain which shall be figured as an item of cost, why should not a seller likewise insist upon a preliminary seller's profit to be figured at cost? If the defendant can say to the patentee that the real gain never arose until the article was sold, wherefore the patentee should pay this so-called manufacturer's profit, why should not the defendant as seller likewise claim that the infringed articles, if the plaintiff himself had made them, would have to be sold by some-body, therefore a customary seller's profit should be charged to the pat-

entee to reimburse the defendant as an item of selling cost, although it was really a gain?

In my judgment, the case of Providence Co. v. Goodyear, 9 Wall. 788, 19 L. Ed. 566, in basing the accountable profits upon the computation of the "difference between cost and yield," and in any event "as a manufacturer calculates the profits of his business," to the end of ascertaining the gain when "both the receipts and payments are taken into the account," can and does furnish the sensible and conclusive rule on the subject. The cases of Warren v. Keep, 155 U. S. 270, 15 Sup. Ct. 83, 39 L. Ed. 144, and Manufacturing Co. v. Adams, 151 U. S. 139, 14 Sup. Ct. 295, 38 L. Ed. 103, have not disturbed this rule. This result would seem to be all the more demanded in view of the tendency, recognized by the master, to make, on behalf of the party charged to account, certain allowances proper to be taken into consideration in figuring cost. They include depreciation or other capital waste, and, as the parties agree, interest on the capital invested in producing the infringing structures. The latter is well illustrative of the good sense of the doctrine which assumes that, although interest may not have been charged upon the books, the capital was in fact appropriated, and with it the appropriation of interest as the measure of its use, which necessarily would have been required of anybody who sought through investment of a like amount to manufacture the articles. When, however, it is sought to add to this an arbitrary amount, in and of itself a gain, after every item of actual outlay has been in fact allowed, it must, as it does, if recognized, become a method of insuring, to one who was both manufacturer and seller, some gain which he made at the expense of the patentee, and which can be attributed to no source except the making of a structure which embodies the patent.

To say, in justification of this, that the patentee "makes a defendant his quasi agent" when he adopts the business done by him, by asking in equity for an accounting of the proceeds of such business, furnishes a like good justification for taking the whole of the profits, or at least putting the patentee in the position where, in any event, he must recognize his so-called agent's rightful claim for reasonable value of the service rendered in the discharge of the tortious agency. Obviously, this of itself might leave to the so-called agent sufficient recompense to have made infringement worth the while. I agree with the master in disallowing this item claimed by the defendant.

Up to this point, by eliminating from the defendant's statement the items considered, and by allowing to him credits such as depreciation, interest on capital invested, by overruling plaintiff's claims for so-called extra profits and interest in profits, the master reaches the conclusion that the defendant made a profit on infringing combinations during the period involved aggregating $47,356.18. It may be observed, before proceeding to consider other contentions in the case, that this result was accomplished with the expert aid of highly skilled accountants, whose labors extended over weeks and months of time, and whose conclusions, so far as they depended, not only upon industry, but integrity and unusual capacity, seem not to have called forth exception from either side. In other words, in the problem confronting the parties and

the master, in so far as it depended upon labors not within the competency of counsel or the master to exert, but upon real skill of able accountants, was made more readily capable of solution. It seems to have brought the case to a point where, as above indicated, the contentions have narrowed down to pure questions of law.

[4] Notwithstanding the apparent result of not only a possible, but rather a clearly rational, apportionment of profits in the aggregate named, the defendant maintains that his result should not be accepted, but that, obediently to the rule or doctrine of comparison of profits, the master, upon the evidence, should have found that the defendant made no profit attributable to the Beckwith invention. It is asserted that Beckwith did not create the reservoir, but that his advance consists in a combination embodying as an improvement a single element not found in the prior art; that the contact plate, if taken as the "soul" of Beckwith's structure, enables a comparison of the improved structure with those of the "open" art; hence it is not only possible, but it is necessary, to make a comparison of the profits made upon the new structure with those not containing the invention, and which were open to the public. If, upon such comparison, it appears that like profits could have been realized upon the latter, then the plaintiff cannot claim that the profits actually found can be attributable to the Beckwith invention.

The statement of the master that "one must confess hesitation to apply this rule," and his final declination to recognize or to follow it, are the object of severe criticism at the hands of defendant's council. But notwithstanding such criticism, and the voluminous brief in support thereof, the action of the master in rejecting the rule is confidently approved. Certainly, if through skilled endeavor of accountants a conclusion is reached that profits in the aggregate amount were made upon the infringing combination, as above indicated, the master could well feel that progress had been made to support the inference that such profits are attributable to the invention. Whatever may be the applicability of this standard of comparison rule to other situations, there ought to be at least hesitation in adopting it where profits have been figured and apportioned without its aid. The obvious danger of attempting to measure recovery, not by what the infringer as a manufacturer or seller in fact made as a manufacturer's and seller's profit on the particular combination, but by the gain, if any, as compared with what he would have made, had he manufactured something which he might, but did not, make—the obvious danger involved is this: It introduces a conjectural basis of evidence; it compels assumptions which are repugnant to the very purpose of giving relief to the patentee for the appropriation which the infringer for some reason chose. It compels comparison of what he actually did, as against a standard which he chose not to follow; it gives prominence to what, but for the invention, he might have done, thereby to get the measure or value of what, apparently, because of the invention, he did do. In other words, the realm of speculation is explored, collaterally inquired into, with the inevitable result of always finding some standard which will lead to nominal recoveries; a practical result of treating the infringement

or appropriation as a mere fortuity, a mere accident of making a selection of one out of several equally desirable courses to pursue.

In further consideration of this, let it be assumed that the very reservoirs suggested by the defendant as standards of comparison could have been made at precisely the same or at variant costs; the infirmity of the rule—the injustice, I believe, of its attempted application—rests in the added hypothesis or assumption that, had any other been chosen, it would have achieved corresponding results in respect of the number of infringing reservoirs which the defendant in fact made and sold. In this way, although the whole manufacture and resulting trade may have been bottomed upon the actual and commercial merit of the appropriated invention, an infringer may still retain his gains and go acquit, except for nominal recovery, because he can show that he gained or saved or profited no more than his competitors in their manufacture and sales of "what he would have been free to make and sell, but did not." The proof may be overwhelming that the particular infringer, in the course of his manufacture and sale, not only met competition, but distanced it, by creating a greater commercial favor for the infringing article, yet so long as he can show that he made no more money than he would have made, had he followed the course of his competitors, he may retain his gains because this enables him to say that he made nothing out of the invention. It results in denial of gains by an infringer who is fortunate enough to have actual or possible competitors in the same general line through whom and whose experience he can place before the court an hypothesis which, after all, enables him to travel in a circle on this matter of gains and profits.

The general proposition advanced by defndant was involved in Warren v. Keep, supra. There concurrent transactions by the infringer were shown, in what are termed the "Hathaway" and the "patented" grates—the former being "open" to the public and therefore offered for comparison. It disclosed profit in its sales equal to the profit made on infringing sales, wherefore nominal recovery was urged, because, so it was contended, the profit on the infringing sales, being no more than on the "open" styles, cannot be "attributed" to the patent. Of course, the moment the Hathaway grate is assumed as a standard, it will not be permissible to ask as a pertinent question, "To what is the profit made on its sale attributable?" But suppose this question, as it well might be, were susceptible of the answer:

"The profits on the sale of the Hathaway grate are attributable to the Hathaway patent as an improvement upon former grates. True, the patent has expired, but that improvement is the substantial basis of sales."

Let it further be supposed that, during the life of the Hathaway patent, its owner sued an infringer; that the latter, upon accounting, was able to force consideration of the "Jones" grate as a "standard," "open" to him, and which, had he made resort to it, would have yielded a profit equal to the profit on the Hathaway grate, wherefore he was subjected to nominal gains only. Manifestly, the question respecting the origin and "attributability" of the "Jones" profits could

in turn be asked and answered through like development, and the case itself becomes limitless in collateral expansion or involution.

It will be granted that this sort of development would never be permitted in a case, not because of the extremeness of the illustrations, but because they disclose the infirmity, legally, of nonrelevancy. Certainly, if such course could be resorted to, it leads to the practical result that, whenever it is possible to show that the patent embodied merely an "improvement," it is not only possible, but quite probable, to establish no profit attributable to it. But, whether a standard be assumed or created, no matter how, the reasoning in the present case is reduced practically to this basis:

The problem, as defendant states it, concerns, not the total profits which it made upon sales of reservoirs embodying the Beckwith invention, but only such quantum of profits as are attributable to that embodiment. It offers, as the fundamental fact, which will solve the problem, that on an unpatented reservoir, which it might have manufactured, a certain profit, equal to the whole profit which it made on the infringing reservoirs, might have been made, and, because the fact thus offered discloses equality, the asserted conclusion is in negation of *attributability* to the patent. The points of resemblance in respect both of the structural characteristics and the profit yield of the respective devices are debited and credited, to the end of justifying the inference, viz., that the point of difference—the Beckwith invention—could not be related to the points of agreement, viz., the profits.

[10] If this is a fair statement of the defendant's argument, its infirmity, in my judgment, rests in this: That the fact which is offered as the basis of the argument cannot meet the elementary and fundamental test of relevancy. Such test is, in brief, that:

"An evidentiary fact can be considered as admissibly relevant only when the desired conclusion based upon it is a more probable or natural, or at least a probable or natural hypothesis, and when the other hypothesis or explanations of the fact, if any, are either less probable or natural, or at least not more probable or natural."

The fallacy of attempting to apply the rule as urged by the defendant grows out of the assumption that, as between an unpatented and a patented structure, whether the latter be a totally new or merely an improved structure, there is in the creation of profits upon manufacture and sale of the structures, respectively, a relation such that points of agreement or points of difference may be resorted to, and, as such, exhibit, in dollars and cents, *attributability* of the whole or parts of the profits to resemblances or differences. In my judgment, common experience forbids such an assumption. Let it be granted that in a certain sense, if it be shown that a profit of $2 per reservoir would have been possible on the South Bend range, and that, because a like profit was made by the defendant upon an infringing reservoir, the conclusion contended for was warranted, what will be the conclusion when once it appears that the defendant not only chose not to make the South Bend reservoir, but made the Beckwith at a less profit, though, because of its acceptability, the volume of its business was fast tending to supersede every other "open" style of range? Does not this show the non-

relevancy of the fact offered in evidence which can with equal force be pressed to establish the rule that no profits can ever be attributed to a patent?

I believe that the matter may be stated in another way: A basic infirmity of the so-called rule of comparison resides in the effort to fasten upon the words "attributable to the invention" a meaning which, with the aid of this rule, can never be satisfied, except by showing increased profits on the individual infringing, as against the "standard," structure. Whereas, the invention and the endeavors of the inventor, not only may have been designed and exerted to increase, but actually do increase, cost and thereby reduce profits, which reduction is expected to find compensation either in increased sale price on increased volume of business, or not at all; or that they were calculated either to reduce or increase in like proportion cost of manufacture and sale price, and thereby maintain the same profit as was earned upon the unpatented or unimproved structure. In other words, the "standard" itself, its high cost of manufacture and its high price, its profit yield, to say nothing of its inferiority, may have prompted the inventor in his efforts, by mere improvement, to lessen the cost of making, the price, the yield, as well as to do something new and useful. So, too, as bearing upon this question of relevancy, these further considerations are not to be overlooked. The infringer, presumably, knows the "standard" and its yield of profit, but he also can and does fix and control, not only the cost, but the sale price, of the infringing structure, and thereby its yield. Therefore it is within his power, at all times, by contenting himself with a yield equal to or smaller than that of the "standard," to escape accounting for profits "attributable" to the invention; and though, by greatly reducing his yield upon the particular structure, he may, as stated, by a greatly increased volume of manufacture and sale, increase his aggregate yield of profits. True, while he may not create or control the "open" or "standard" structure, or its yield, yet he can by his own conduct, at will, frustrate the probative force or effect of the "standard," and hence the *result* of a "comparison." Or, as indicated, assuming that he might be quite innocent respecting the standard, his whole endeavors may have been exerted, his whole profits may have been earned, in his estimate of, and upon the public's faith in, the "improvement"; he still has the right, under this rule, to learn in an accounting suit that he in fact made his profit in spite of, not because of, the "improvement."

[5, 6] This extended discussion has been attempted by way of response to the insistence of defendant's counsel for the application of this rule leading to nominal recovery only, upon any aspect of the case; and the discussion likewise aims to justify following Warren v. Keep, which, in my judgment, denies legal relevancy to facts upon which the "rule" may be urged. The various illustrations or analogies have been suggested with a view of demonstrating that, in a case like the one before us, an attempt to apply this rule must fail, because the fundamental fact, the adoption of a so-called "standard" or "open" structure and the profit which it yields, cannot meet the elementary test of relevancy —if we are permitted to assume that such test proceeds only upon the apprehension of a natural or probable relation between the fact and

the conclusion to be deduced from it. It is believed that a consideration of the matter in this elementary light demonstrates that an established profit upon an "open" structure, which, as we have seen, may be attributed to a variety of causes, is not and cannot be made the basis for inferring that an equal profit in a patented structure was not attributable to the invention; that, in any event, the susceptibility of a fact to produce an inference must be denied, when the probative force or effect of that inference may be wholly frustrated, at the option of the one to be affected by it.

I am thus of the opinion that the master properly declined to recognize the doctrine of comparison, and that he rightly resorted to the evidence respecting profits as real evidence justifying directly the sum found; that in doing so he properly considered the infringing combinations made by defendant as unitary, not to be broken up, to the end that a necessarily arbitrary and wholly speculative apportionment or segregation of profits be allotted to each physical piece responding to the appropriate element of the combination claim, be made or attempted; and the exceptions to his findings and to the refusals to find are overruled.

[7] We are brought to the finding on the damages; and, of defendant's contentions, these will be considered: (1) Those attacking the award of any damages other than nominal, on the grounds asserted; (2) those relating to the amount actually awarded.

Counsel advances the broad proposition that a patentee can sustain "actual damages" only when "one or the other of four sets of facts or circumstances are shown to exist." They are: (a) That the owner of the patent is manufacturing and selling the patented device; (b) that the infringements "prevent the owner" from establishing the business of manufacturing and selling; (c) that the owner of the patent "is granting licenses on a royalty basis"; (d) that the infringements have "prevented" the owner of the patent "from effecting arrangements on a royalty basis to establish a license fee." In effect, the proposition is that, no matter how valuable the patent or how flagrant the infringement, the owner, until attended by one or more of the "set" of circumstances as sort of jurisdictional prerequisite, or sine qua non, does not and cannot show himself legally qualified to suffer damage for which substantial redress may be given.

I know of no rule of law which declares that trespasses upon property or property rights are nominal whenever the trespasser can show that the owner, at the time of the trespass, was not gainfully occupying his property or exercising his rights; that his house, unless he lived or pursued a gainful vocation in it, or rented or tried to rent it, or was prevented from renting or trying to rent it because occupied by a trespasser, may be burned by any one at the hazard of nominal damages only. It is a sufficient answer to the contention that the law does not attempt in advance to enumerate with precision, or categorically, the times, places, circumstances, or situations in or under which a patent owner may be substantially damaged, any more than it does with respect to owners of other property or property rights. The cases cited by plaintiff not only give abundant support to this, but point out that in patent cases, as in others, the right to damage, substantial or nom-

inal, depends upon the proof in the particular case. Obviously, quantum or quality may vary as the character of cases, in their susceptibility to quantum or quality of proof, varies. But, when it is conceded that a "reasonable royalty" can furnish a measure for damages, it must likewise be conceded that plaintiff assumed no burden other than to adduce evidence competent to establish it.

[8] Now, if the idea of a reasonable royalty as a measure of damage to a patentee is at all analogous to other situations where the law imports "reasonableness" as an element, then the degree to which the act of the wrongdoer has been profitable or unprofitable to himself cannot be a controlling test. Wherefore the fact that defendant is shown to have made $47,000 "profits," apportioned as "legally attributable" to the embodiment of the invention in the combination structures made by it, cannot limit the proofs in their legitimate tendency—as it may develop —to either a larger or smaller amount as reasonable royalty damage. True, profits actually made may be considered; but that their amount must be taken as the test of reasonableness, or that profitless infringing must negative damage by defeating the exaction of a reasonable royalty by a patentee, is no more possible in measuring damages in respect of infringement, than would be the attempt of a lessee at will or sufferance to limit or defeat reasonable recovery by proving his occupation of the tenement to have resulted in little or no profit to him.

When, therefore, the restriction contended for cannot be recognized, and the inquiry is subject to be tested, not by the infringer's "legally attributable" profits, but rather by the character and value of the patentee's property right and the damage to him by its invasion or appropriation, the master was bound to resort to the large range of testimony, pertinently bearing upon the reasonable amount to be awarded. In the discharge of that duty he rightfully considered everything disclosed in this litigation which had a tendency to establish that Beckwith's invention was a highly important and valuable contribution to the art, its creation of profits actually made by defendant upon its embodiment in infringing structures, its efficacy to contribute directly or indirectly, and its actual direct or indirect contribution to the success of the infringer's business of manufacturing and selling reservoir ranges, and, generally, its value as property, to the end of ascertaining the reasonable value of its use or the exercise of the rights growing out of it.

Certainly the defendant's conduct and actual experience during the infringing period, in so far as it disclosed its own estimate of the importance and value, and the court's adjudication respecting the merit, of the invention, have persuasive bearing upon this matter, which is at the bottom of the inquiry. Admittedly the plaintiff may not have resorted to evidence sometimes offered to prove reasonable royalty —he may not have been able to—but that did not bar resort to "other available, pertinent proofs." Frumentum v. Lauhoff, 216 Fed. 610, 132 C. C. A. 614. So, when the plaintiff offered the opinions of men qualified by experience to speak directly to the matter of reasonable royalty, when the wide range of testimony in the record is appealed to, the case in my judgment presents a great array of facts and circumstances, not only competent, but persuasive, to

support the award made by the master; and the most careful study of defendant's brief upon this phase of the case cannot avoid the conviction that the criticisms of evidence bear, not upon its competency, but its weight and credit. Therefore, even if some or all of the criticisms be granted the latter merit, the master's report is none the less unassailable. The exceptions upon this branch of the case are overruled.

[9] The final matter for consideration pertains to the exercise of the court's power to increase damages upon the facts reported by the master. The subject is treated under five heads, namely:

First. That the defendant was guilty of a deliberate and intentional appropriation of Beckwith's device. The master adopted the facts originally found by the court, viz.:

"Among other experimenters was the defendant company. About the time the complainant's range came on the market, defendant was engaged in conducting certain experiments on sheet metal reservoirs at the hardware store of one Rassman at Beaver Dam, Wis. While these experiments were going on, Rassman, who was also sales agent of the Beckwith range at Beaver Dam, had occasion to visit Dowagiac, Mich., and there saw one of the Beckwith ranges built under the patent in suit. Rassman came back and told defendant that Beckwith had solved the problem of the right-hand reservoir. Thereupon one of the new Beckwith ranges was obtained, and at the store of Rassman defendant's officers and experts made a thorough examination of the same, and extended to Beckwith the compliment of adopting and appropriating all the elements of his device. Thereupon the defendant in its catalogue gave prominence to the convex rigid back plate as a new and prominent feature. The clamping apparatus adopted by the defendant differed in form, but was clearly a mechanical equivalent of the Beckwith clamping means. In the defendant's structure introduced in evidence convexity of the back plate is five-eighths instead of three-eighths of an inch, as shown by the Beckwith structure."

Second. That the activities of the defendant in connection with the "Moylan" range constitute "a direct connecting link between the Rassman incident (referred to in I, supra) and the manufacture of the infringing type," and, as such, embodied "a deliberate attempt to imitate and use in part, in its in-standing bulged contact plate, the Beckwith invention."

Third. That the failure of the defendant to cease infringement upon receipt of a letter, June 16, 1905, from the plaintiff's attorneys, cannot be regarded as evidence of wantonness, malice, or unreasonableness, because the defendant had the right, under advice of counsel, to contest the Beckwith patent; and this was presumably done in good faith.

Fourth. That the McClure patent, dated June 27, 1909, "impresses me," says the master, "as a deliberate attempt on the part of the defendant to deprive the complainant of the benefits of its patent." It was applied for during the pendency of the litigation, but the fact was not disclosed until brought out by complainant upon the hearing before the master. The master further says:

"The file wrapper and correspondence with the Patent Office show that every effort was made to obtain a patent by which the defendant could secure to itself all possible benefits of the Beckwith patent. The Patent Office, however, cited the Beckwith patent and others, and refused to issue to Mr. McClure

a patent on the essential elements of the Beckwith patent, giving him only what may be roughly described as a combination of a convex plate, reservoir, and means of adjustably regulating the contact by tilting the reservoir; the chief feature being the adjustable clamping means. This patent was abandoned after the injunction issued in this case."

Fifth. The pending litigation. Its duration and many incidents, summarized by the master, lead him to "express his opinion thereon, which is that, so far as he can see, they do not seem, on the whole, to have been taken by the defendant vexatiously, merely for delay, unconscionably, or in a 'stubbornly litigious' spirit." He expresses the further conclusion that, in the proceedings before him, he cannot conclude that defendant has used bad faith, nor willfully delayed the same, and that the defendant's conduct in the litigation cannot be considered, upon his conclusion, as forming "ground for increasing damages."

It will be granted, I assume, that, when once facts are brought to the attention of the court which bear pertinently upon the infringer's malicious or wanton conduct, not merely in litigation, but in respect of matters pertaining to infringement, conduct which may precede or which may concur with litigation, there is created a basis upon which the court, in its discretion, may exercise the conceded power. Therefore, in considering the five matters which are brought before the court by the master's report, I have no difficulty in concluding that a mere failure to cease infringement, likewise the exhibition of a pugnacious disposition in litigation, when standing alone, cannot ordinarily furnish a sufficient basis. But the facts found by the master—not to be assailed for the want of evidence to support them—which convict the defendant of a deliberate purpose to appropriate the invention, to appropriate that which (it was one of the first to recognize) "had solved the problem of the right-hand reservoir"; its course and conduct from the outset, in attempting to fortify itself in its appropriation; the act of seeking, and persisting in its efforts to get a patent, through its chief officer, which embodied the essentials of Beckwith's construction, coupled with some colorable changes—these facts furnish, in my judgment, ground for an appeal to the exercise of the power to increase damages, which cannot be ignored. Their recognition is called for, notwithstanding the presumptive good faith in following the advice of counsel respecting cessation of infringement, or like advice respecting vigorous defense of litigation. They are facts which at once subordinate the latter facts, and the color of good faith which is derived from advice of counsel cannot lessen or impair the efficacy of the other facts to condemn the defendant's conduct as involving a deliberate and willful purpose.

Had the defendant prevailed in this litigation, it would have found, in such result, legal exculpation for the conduct referred to; but, having lost, its vigorous good-faith efforts, through counsel, to succeed, furnish neither legal nor actual exculpation for its conduct. The litigation forced it either to admit or to deny the plaintiff's rights; and therefore, at all times, like any deliberate infringer, it has been in the perilous position where the judgment upon its denial of plain-

tiff's rights might carry with it condemnation of its conduct outside of the lawsuit.

I assume that an infringer, howsoever flagrant his conduct, may stand mute and await suit; that he may have the lawsuit defended in a vigorous and perfectly lawyerlike manner; in short, that he may compel the patentee to prove his case; but he does not thereby effect a transformation of nor eliminate his conduct as a circumstance of the "case"—the latter means, not the formal legal proceeding and its incidents, but rather the subject-matter and its attendant "circumstances"—particularly the infringer's conduct as disclosing a conscious purpose or delinquency in respect of matters of common fairness.

Whether the object in granting to courts this power to increase damages be to reimburse or compensate for matters not of themselves evidencing damage legally recoverable, or whether it is punitive, or both, certainly, if the conduct of a defendant has been found to warrant its exercise, then that conduct, and the sacrifices which a patentee must make to obtain a vindication of his rights and redress for his grievances, may both bear pertinently upon the degree to which the court exert the power. I am satisfied that the circumstances justify an increase of the damages awarded by the master by 20 per cent.; and that increase will be awarded.

The exceptions to the master's report, filed by either party, not herein considered, are severally overruled; and a decree may be entered upon the report as modified.